IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| YVONNE CELESTINA CATWELL ) | |
| ) | |
| v. ) | No. 3:13-0234 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To: The Honorable John T. Nixon, Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under Title II of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to which defendant has responded (Docket Entry No. 18). Plaintiff has further filed a reply in support of her motion. (Docket Entry No. 24) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 8),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I. Introduction

Plaintiff filed her application for benefits in April 2009, alleging disability

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

onset as of July 1, 2004. (Tr. 108-09) Her application was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on November 9, 2011, when plaintiff appeared with counsel and gave testimony. (Tr. 31-56) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until December 12, 2011, when she issued a written decision finding plaintiff not disabled. (Tr. 14-21) That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 1, 2004, through her date last insured of December 31, 2005 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following medically determinable impairments: fibromyalgia and depression (20 CFR 404.1521 *et seq.*).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2004, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(c)).

(Tr. 16, 21)

On February 21, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of

2

the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following summary of the record evidence is taken from defendant's brief, Docket Entry No. 18 at pp. 2-7:

A. <u>Medical Evidence</u>

1. <u>Prior to the Expiration of Plaintiff's Insured Status</u>

On August 23, 2004, Plaintiff saw Dr. Scott Baker for an initial consultation for bilateral leg pain and right shoulder pain (Tr. 212). On examination, Plaintiff had full range of shoulder motion with no impingement or instability (Id.). She had full flexion and extension on cervical range of motion and rotation to 70 degrees bilaterally (Id.). Straight leg raising was negative to 60 degrees bilaterally (Id.). Plaintiff had numerous tender points (Id.). She had normal (5/5) strength, in her hips, knees, shoulders, elbows, wrists, fingers, and thumbs (Tr. 212-213). Strength in her right great toe was 4/5 and was full in the left (Tr. 213). Her reflexes were symmetrical and normal (Id.). Her gait was mildly antalgic (Id.). Plaintiff was able to walk on her heels and toes, and squat and stand (Id.). Sensory examination was normal (Id.). Dr. Baker believed that fibromyalgia/generalized myofascial pain syndrome best explained Plaintiff's symptoms (Id.). He recommended conservative treatment, including physical therapy, medication, a home exercise program, and staying

active (Id.).

Plaintiff saw Dr. Baker again on September 24, 2004 (Tr. 211). Plaintiff stated that she was doing better (Id.). On examination, Plaintiff was "exquisitely" tender, "almost excessively" so, throughout her occiput, cervical, upper trapezius, thoracic, lumbar gluteals, medial femoral condyles, lateral epicondyles, and wrists (Id.). Her cervical, shoulder, and lumbar ranges of motion were normal, with no evidence of instability (Id.). Dr. Baker again recommended conservative treatment, including physical therapy, medication, a home exercise program, and staying active (Id.).

Plaintiff had seven physical therapy sessions (Tr. 220). She said that her lower back pain was better, she still had pain, "but not like before" (Id.). She reported an increase in pain with shopping, or walking/standing for long periods of time (Id.). She discontinued treatment on October 11, 2004, because of problems with transportation (Id).

On October 22, 2004, Plaintiff reported to Dr. Baker that she had severe pain involving her entire left side (Tr. 210). Dr. Baker noted that Plaintiff appeared comfortable and moved around the examination room without difficulty (Id.). On examination, Plaintiff was noted to be almost excessively tender, hollering in pain at even the lightest touch in the cervical, upper trapezius, lumbar, and gluteal areas (Id.). Dr. Baker prescribed Duragesic patches and suggested that Plaintiff have an MRI of her brain and cervical spine to rule out a central process such as Multiple Sclerosis (Id.). An MRI of Plaintiff's brain was normal (Tr. 224). An MRI of her cervical spine showed multilevel degenerative disc disease with minimal/mild canal stenosis at C3-4 and C4-5, and mild to moderate stenosis at C5-6 (Tr. 222-23).

On November 19, 2004, Plaintiff reported to Dr. Baker that the Duragesic patches

worked well for a week, but then they ceased to help (Tr. 209). Plaintiff reported that she had some right hand numbness and had had carpal tunnel syndrome on the right in the past, so Dr. Baker provided a wrist splint (Id.). Dr. Baker observed that Plaintiff appeared comfortable and moved around the examination room without difficulty, and had no cognitive impairment (Id.). He prescribed Cymbalta for pain and depression (Id.).

Plaintiff next received treatment on April 24, 2005, when, while working as a security guard, she closed a door on her right hand (Tr. 206). An x-ray revealed that there was no fracture or dislocation (Tr. 208).

On December 16, 2005, Plaintiff had an MRI of her left foot following her report of a lump on the bottom of the foot that caused pain with walking (Tr. 275). The MRI showed a 2.8 cm. lesion that was believed to be a planter fibromatosis (Tr. 275).

Dr. Celia Gulbenk, a State agency physician, reviewed the medical evidence from July 2004, Plaintiff's alleged onset date, through December 2005, her date last insured (Tr. 457). Dr. Gulbenk wrote that the medical evidence for this time frame showed that Plaintiff was followed from August – November 2004 for a diagnosis of fibromyalgia (Id.). She had tender trigger points, normal motor testing, no mention of sensory loss, an antalgic gait, and negative straight leg raising testing (Id.). She was treated with physical therapy and pain medication (Id.). In November 2004, Plaintiff could move about, walk, and do gait maneuvers without difficulty (Id.). There was no further medical evidence regarding fibromyalgia prior to the expiration of Plaintiff's insured status (Id.). Dr. Gulbenk concluded that Plaintiff had not established the presence of severe fibromyalgia or other impairment persisting for 12 months during the relevant time frame (Id.).

2. <u>After the Expiration of Plaintiff's Insured Status</u>

On January 18, 2006, Plaintiff went to the Summit Medical Center emergency room complaining of pain in her left arm and the left side of her neck, that began the previous day, (Tr. 238). Following examinations and testing, including a normal electrocardiogram, Plaintiff was reassured that her symptoms did not appear to be from a serious cause and she was sent home (Tr. 239).

On December 4, 2006, Plaintiff saw Dr. Shan-Ren Zhou for a consultation regarding headaches (Tr. 421). Plaintiff reported that she had pain in the back of her head mostly on the right side, and she sometimes had a loss of concentration and memory (Tr. 421). Dr. Zhou described Plaintiff as pleasant, depressed, and in no acute distress (Id.). General examination was unremarkable and motor, sensory, and coordination exams were all normal (Id.). An MRI of Plaintiff's brain was unremarkable (Tr. 434).

On January 23, 2007, Plaintiff saw Dr. Ernesto Vasquez at Summit Primary Care with complaints of low back pain (Tr. 317). On examination, straight leg raising test was negative (Id.). Plaintiff had paraspinal muscle tenderness and spasm (Id.). Her strength, reflexes and sensation were normal (Id.). A lumbar MRI showed mild L4-5 disc dehydration and minimal disc bulge, there was no significant stenosis, and there was no nerve root deviation (Tr. 268).

Plaintiff returned to Dr. Vasquez on July 17, 2007, this time with complaints of fatigue, chest pains, and dyspnea on exertion (Tr. 326). Plaintiff reported that she tried to eat well and exercised (Id.). Examination was normal (Tr. 326-27).

Plaintiff saw Kristin Williams, a physician's assistant, at Summit on July 20, 2007 (Tr. 362). Plaintiff complained of a headache and lightheadedness for two days (Id.). She noted that on the previous day she cut down from a pack to two cigarettes and this typically made

her jittery and shaky (Id.). Examination was normal (Tr. 362-63). Plaintiff was prescribed anti-anxiety and smoking cessation medication (Tr. 363).

On August 2, 2007, Plaintiff told Dr. Vasquez that she had lightheadedness, malaise, and mid-back pain radiating to the upper right abdomen (Tr. 331). Dr. Vasquez noted that a neurological workup was negative and suggested that cardiac etiology be ruled out (Tr. 332).

On September 28, 2007, Plaintiff had an EEG pursuant to a referral by Dr. Zhou (Tr. 426). The test results were normal (Id.).

On November 1, 2007, Plaintiff saw Dr. Richard Pak at Summit with complaints of off and on chest pain of two weeks duration (Tr. 338). An electrocardiogram was abnormal and it was suggested that Plaintiff have a stress test (Tr. 339).

On January 14, 2008, Plaintiff returned to Dr. Pak (Tr. 342). She said that she was having problems with hypoglycemia and headaches (Id.). She said that she was seeing Dr. Zhou for headaches, but she wanted a second opinion (Id.). Dr. Pak discussed diet changes with Plaintiff (Tr. 343).

On May 23, 2008, Dr. Zhou wrote a letter addressed To Whom It May Concern, stating that he treated Plaintiff for "memory difficulty and spells" (Id.). He wrote that he felt that it would not be wise for Plaintiff to take any test at this time and that he was sending her to a psychologist to help the memory and confusion issue (Id.). A May 29, 2008, MRI of Plaintiff's brain was normal (Tr. 432).

On June 2, 2008, Plaintiff reported to Dr. Pak that she had neck stiffness and pain from doing sit-ups (Tr. 344). The muscles in Plaintiff's back and neck were very sensitive to touch (Id.). Dr. Pak wrote that Plaintiff's fibromyalgia was unchanged (Id.).

On August 18, 2008, Plaintiff complained to Dr. Pak of left side pain since a fall a

month ago (Tr. 353). Plaintiff was in no acute distress (Id.). Dr. Pak assessed that Plaintiff's fibromyalgia was unchanged (Id.).

On April 10, 2009, Plaintiff saw Dr. Pak (Tr. 375). She was seen in the emergency room the prior day for cold feet and legs, and pain in her left leg and groin area (Id.). She was told she had neuropathy and to follow-up with her doctor (Id.). On April 15, 2009, Plaintiff completed a pain questionnaire for Dr. Pak, noting that she had pain in her legs for three months (Tr. 403). She said that the pain was relieved with medication (Id.). An electrodiagnostic study indicated lumbar radiculopathy (Tr. 402).

On May 26, 2009, Dr. Zhou wrote a letter addressed To Whom It May Concern, stating that Plaintiff had been coming to him "for the past several years" and she had diagnoses of memory loss, cervical pain, parasthesia, chest pain, and migraines (Id.).

On June 14, 2010, Dr. Zhou wrote a letter addressed To Whom It May Concern, stating that Plaintiff had been a patient of his for many years (Tr. 464). She had diagnoses of trigeminal neuralgia, paresthesia, and cervicalgia, and these conditions cause intense pain and seriously limit Plaintiff's ability to maintain employment (Tr. 464).

On February 9, 2011, Dr. Zhou completed a form in which he opined that since 2002, because of cervical pain, trigeminal neuralgia, memory loss, syncopal spells, and migraine, Plaintiff could occasionally lift and carry up to ten pounds; and she could sit for an hour, and stand or walk for 30 minutes at a time (Tr. 459, 463).

B. <u>Hearing Testimony</u>

At the November 9, 2011, hearing, Plaintiff testified that she was born on March 2, 1956 (Tr. 34). She said that she has a current license, but she stopped driving three or four years ago (Tr. 35). She said that she reads when she does not have a headache and does word

8

puzzles (Tr. 37). Plaintiff said that she worked part-time in 2005 and stopped because her employer moved (Tr. 47). She explained that some days she can do chores around the house and cook and some days she cannot (Tr. 44).

Plaintiff said that she is unable to work because of depression, panic attacks, anxiety, memory problems, and heel spurs (Tr. 39). She said that she had a mini-stroke two years ago (Tr. 37). She said that she just began treatment with a therapist because her symptoms were getting worse (Tr. 40). Plaintiff said that because of sciatic nerve problems she could sit or stand for only 20-25 minutes and she could walk for a block (Tr. 41). Plaintiff testified that she has pains all over her body from fibromyalgia (Id.). She said that she had fibromyalgia pain, cervical pain, headaches, carpal tunnel syndrome, and depression in 2004 and 2005 (Tr. 48-51). She said that she saw Dr. Zhou for about ten years (Tr. 50-51).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). While this is a deferential standard, it is not a trivial one; a finding of substantial evidence must "take into account whatever in the record fairly detracts from its weight."

9

Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990). Nevertheless, the SSA's decision must stand if substantial evidence supports the conclusion reached, even if the record contains substantial evidence that would have supported an opposite conclusion. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed

10

> impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry ... the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications

11

to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first contends that the ALJ failed to give appropriate weight to the assessment of Dr. Zhou, a treating neurologist. Dr. Zhou's assessment, rendered in 2011 but purporting to represent plaintiff's limitations since 2002, contains significant restrictions against sitting, standing, walking, and lifting due to "cervical pain, trigeminal neuralgia,[2] memory loss, syncope/spells and migraine." (Tr. 458-63) The ALJ addressed Dr. Zhou's opinions as follows:

> Dr. Zhou's opinion is substantially inconsistent with the medical evidence of record for the relevant time period of July 1, 2004, through December 31, 2005. For example, Dr. Zhou opined that the claimant could only sit for a total of one hour in an eight-hour workday and that she could only stand for a total of 30 minutes in an eight-hour workday. Such restrictions are without basis. In light of the foregoing, Dr. Zhou's opinion is given no weight. ... The undersigned notes that medical records from Shan-Ren Zhou, M.D., ostensibly

---

[2]"Trigeminal neuralgia is a chronic pain condition that affects the trigeminal nerve, which carries sensation from your face to your brain."
http://www.mayoclinic.org/diseases-conditions/trigeminal-neuralgia/basics/definition/con-20043802

encompass the relevant time period of July 1, 2004, through December 31,
2005. However, Dr. Zhou's records only include treatment notes prior to July
1, 2004, or after December 31, 2005. Thus, Dr. Zhou's records do not contain
any treatment notes for the relevant time period.

(Tr. 19-20)

More particularly, as defendant points out, the record reflects that Dr. Zhou saw plaintiff on one occasion in July 2002, when he was the attending physician at Summitt Medical Center who interpreted her EEG study ordered to rule out seizures (Tr. 435), but did not provide any recorded treatment. He next saw plaintiff in December 2006, in consultation for headaches (Tr. 423-24). Regardless of his subsequent status as a treating physician, Dr. Zhou's complete lack of treatment within a year of the period relevant to plaintiff's disability claim is a good and sufficient reason to reject his assessment, particularly as it appears that plaintiff's health declined considerably after 2005, as noted by the ALJ. (Tr. 21) Indeed, it does not appear that plaintiff had been diagnosed with trigeminal neuralgia or syncope prior to the expiration of her insured period. In addressing a similar scenario, the court in Schlacter v. Astrue, 2012 WL 567609 (N.D. Ohio Feb. 21, 2012), offered the following authority for finding that the passage of time between the expiration of a claimant's insured period and the beginning of the treatment relationship constituted good reason for discounting the weight of the treating physician's opinion:

> The Sixth Circuit has held that a treating physician's opinion, based on a treatment record that began eight months after the date last insured, was not entitled to substantial weight. *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam). In *Renfro v. Barnhart,* the Sixth Circuit found that a treating physician's opinion as to a claimant's RFC was not entitled to controlling weight where the treating physician was the claimant's treating physician only after her date last insured and reports from

13

other treating physicians during the relevant time period did not indicate that
she was as functionally limited as that found after that date. No. 00–4457, 30
Fed. Appx. 431, 2002 WL 252438, at *6 (6th Cir. Feb. 19, 2002), unpublished.
Additional cases support the holding that evidence issued after a date last
insured generally lacks probative value. *See Higgs v. Bowen*, 880 F.2d 860, 863
(6th Cir. 1988) (tests from 1981 and 1983 were "minimally probative" of
claimant's condition in 1979); *Liebisch v. Sec'y of Health & Human Svcs.*, 1994
WL 108957, *2 (6th Cir. Mar. 30, 1994) (1990 report was "necessarily less
accurate" about claimant's condition from 1985–89 than it was about her status
in 1990); *Weetman v. Sullivan*, 877 F.2d 20, 22 (6th Cir. 1989) (deterioration in
the claimant's condition after the period of eligibility is irrelevant).

Id. at *9. In light of the above authority and the treatment record in this case, the undersigned finds that the ALJ gave good reasons for rejecting the assessment of Dr. Zhou.

Plaintiff next argues that the ALJ erred in finding that she had no severe impairments prior to her date last insured, December 31, 2005, and that the ALJ should have made this determination with the aid of a testifying medical expert. Relatedly, plaintiff argues that the ALJ erred in finding that her complaints of significant pain from her allegedly severe impairments were not credible for the period prior to December 31, 2005, inasmuch as the ALJ failed to consider a pain questionnaire and report of medication side effects submitted by plaintiff.[3]

In evaluating the severity of plaintiff's medically determinable impairments, the ALJ began by considering plaintiff's testimony at the November 2011 hearing as to the

---

[3]Plaintiff further takes issue with the ALJ's credibility finding because it was "based on the fact that she has been able to perform some activity on a very minimal basis," and because it did not "specifically state whether [s]he found the claimant's testimony credible or not credible[.]" (Docket Entry No. 15 at 18) However, these are merely boilerplate assertions that are inapplicable to the decision under review here, where plaintiff's daily activity level is not discussed and the credibility finding is perfectly clear.

14

symptoms which kept her from working during her insured period:

> At the hearing, the claimant alleged the primary symptom of pain, including generalized pain from fibromyalgia, headaches, and neck pain; in response to questioning by her representative, the claimant's allegations concerning pain were made specifically in regard to the relevant time period of July 1, 2004, through December 31, 2005. The claimant alleged that her pain was substantial and, essentially, pervasive. For example, the claimant testified that sometimes even taking a shower was painful due to the water hitting her skin. The claimant testified that her fibromyalgia-related pain was "all over" and that it was painful for her to be touched. She alleged that she would get very bad headaches, which were often triggered by sunlight or by being upset. The undersigned notes that the claimant's testimony concerning the limiting effects of her pain was somewhat vague, other than to state that she experienced these types of pain regularly and that the pain was substantial.

(Tr. 18) As to her fibromyalgia, plaintiff takes issue with the ALJ's finding that the evidence failed to support the duration of that impairment for a continuous period of at least twelve months (Tr. 20), citing the fact that she was first diagnosed with the condition during her insured period and still carried the diagnosis in 2009. However, the undersigned finds substantial evidence supporting the ALJ's determination that plaintiff's fibromyalgia did not meet the duration requirement, as "the relevant medical evidence spanned only a few months in late 2004[.]" Id. As recounted by the ALJ, aside from documentation of a hysterectomy, a colonoscopy, and an emergency room visit for a hand injury, the only other medical treatment of record during plaintiff's insured period is contained in the notes of four visits with Dr. T. Scott Baker, M.D., from August 23 to November 19, 2004. Dr. Baker's records reflect that plaintiff was referred to him by Dr. Lisa Miller, M.D., but the record does not contain any treatment notes from Dr. Miller's office. Dr. Baker diagnosed plaintiff's "fibromyalgia/generalized myofascial pain syndrome," referred her to myofascial based

physical therapy, and prescribed trials of several narcotic pain medications in an effort to control plaintiff's symptoms. However, plaintiff discontinued the physical therapy due to difficulties with transportation (Tr. 220), and did not respond to treatment with narcotic pain medications (Tr. 209-210), leading Dr. Baker to observe that it is "difficult to explain the severity of her symptoms" (Tr. 210). At his last visit with plaintiff, in November 2004, Dr. Baker prescribed Cymbalta "for both pain and depression" (Tr. 209), and additional notes from his office reflect refills of Cymbalta at plaintiff's request as late as May 2005. (Tr. 217-18) In June 2005, plaintiff called the office requesting another Cymbalta refill, but was told that no more refills would be ordered until she had been seen by the doctor. (Tr. 218) Plaintiff did not return to Dr. Baker, nor did she seek further treatment of her generalized pain in 2005. In fact, the record reflects that the only medical treatment of any kind that plaintiff sought in 2005 appears to be emergency room treatment of a hand injury plaintiff sustained while at work in April 2005.[4] (Tr. 206) There are records of imaging performed on various parts of the body later in 2005 with benign results (Tr. 273-82), but no corresponding treatment notes. It is plaintiff's burden to prove the existence and severity of limitations caused by her impairments during the relevant period, Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003), a burden she has failed to carry here. Although plaintiff cites her treatment for fibromyalgia in April 2009 (Docket Entry No. 15 at 15 (citing Tr. 295)), this is not sufficiently proximate to the period at issue here to reasonably support the duration of the impairment for 12 consecutive months from August 2004, so as to overcome the lack of

---

[4]While plaintiff resumed part-time work in 2005 (Tr. 47), the ALJ found that "[t]he claimant's 2005 earnings in the amount of $4,764.23 resulted in average monthly income of $397.02, which is below the applicable substantial gainful activity threshold of $830." (Tr. 16)

medical evidence from 2005; indeed, plaintiff stated in a September 2009 questionnaire that her fibromyalgia symptoms were currently "more severe" than they were when she was diagnosed in 2004 (Tr. 147). Substantial evidence supports the ALJ's determination that plaintiff's fibromyalgia was not severe during her insured period.

Plaintiff argues that the ALJ erred in failing to find a severe impairment to her cervical spine in light of MRI results identifying "mild to moderate spinal canal stenosis" at the C5-C6 level. (Tr. 222) However, after ordering this cervical MRI as well as a brain MRI "to rule out a central process, such as Multiple Sclerosis" as a source of plaintiff's generalized pain (Tr. 210), Dr. Baker did not prescribe any treatment or observe any need to follow up on this spinal condition apart from his treatment of her generalized body pain (Tr. 209), discussed above. Accordingly, the record substantially supports the ALJ's determination of no severe cervical impairment.

Plaintiff argues that the ALJ should have called a medical expert to testify at plaintiff's hearing as to whether she had a severe impairment prior to her date last insured, because "[t]he ALJ, as a layperson, lacked the proper knowledge to decide" this issue. (Docket Entry No. 15 at 15-16) In support of this contention, plaintiff again refers to the assessment of Dr. Zhou, touting the reliability of his 2011 opinion that plaintiff's conditions produced symptoms at a disabling level of severity as early as 2002. However, as concluded above, Dr. Zhou's assessment was properly discounted. Moreover, as the court in Schlacter v. Astrue found in addressing the same issue:

> The primary function of a ME is to explain the medical terms and findings in complex cases in terms that the ALJ, who is not a medical professional, may understand. *Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d

17

> 842 (1972). The decision to call a ME is generally within the ALJ's discretion. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986). The Court may overturn the ALJ's decision only if it appears that using a ME was "necessary-rather than simply helpful-in order to allow the ALJ to make a proper decision." *Young v. Comm'r of Soc. Sec.*, No. 2: 10CV960, 2011 WL 2923695, at *6, citing *Landsaw*, 803 F.2d at 214, quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir.1977). The Court finds that using a ME in this case was not necessary as the ALJ analyzed the record, both predating her onset date and postdating her date last insured, articulated his reasons for the weight given to her treating physicians, and had substantial evidence to support his findings.

Schlacter, 2012 WL 567609, at *11. Here, as in Schlacter, the ALJ gave due consideration to the evidence of record which postdated plaintiff's date last insured, gave good reasons for her weighing of Dr. Zhou's assessment and the other opinion evidence, and simply did not have need of medical expert testimony to inform the legal determination at step two, which was driven by an evidentiary shortfall rather than any improperly resolved ambiguity from a complex medical record. Accordingly, plaintiff's contention that the ALJ erred in failing to call a medical expert is without merit.

Lastly, plaintiff argues that the ALJ erred in failing to consider a pain questionnaire and report of medication side effects submitted by plaintiff in September 2009 (Tr. 147-50). Although the ALJ did not explicitly discuss this questionnaire, it does not follow that she necessarily failed to consider this evidence. "[A]n ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party." Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 507-08 (6th Cir. Feb. 9, 2006) (quoting Loral Defense Systems-Akron v. N.L.R.B., 200 F.3d 436, 453 (6th Cir. 1999)). In any event, as referenced above, plaintiff's responses to that questionnaire do not purport to relate to the limited period of her disability insurance, and in fact describe a

18

worsening of her fibromyalgia symptoms since that time.  The questionnaire further describes side effects from hydrocodone (Lortab), which the record does not show she continued to have prescribed for her by Dr. Baker (Tr. 217-18), as well as contraindications with her blood pressure medicine, though she does not appear to have been diagnosed with or treated for high blood pressure during her insured period.  The undersigned finds no error here.

In sum, the decision of the ALJ is supported by substantial evidence on the record as a whole.  That decision should therefore be affirmed.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 1st day of August, 2016.


                           s/ John S. Bryant
                           JOHN S. BRYANT
                           UNITED STATES MAGISTRATE JUDGE